APPEAL,MJLC3,SCHEDCONFSET,STAYDISC

# U.S. District Court
# DISTRICT OF KANSAS (Kansas City)
# CIVIL DOCKET FOR CASE #: 2:21–cv–02489–DDC–ADM

Countryman–Roswurm v. Wichita State University et al

Assigned to: District Judge Daniel D. Crabtree
Referred to: Magistrate Judge Angel D. Mitchell
Cause: 42:2000 Job Discrimination (Sex)

Date Filed: 10/25/2021
Jury Demand: Plaintiff
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

**Karen Countryman–Roswurm**   represented by   **M. Kathryn Webb**
Law Office of M. Kathryn Webb, LLC
7430 East 26th Street N
Wichita, KS 67226–1706
316–682–4616
Alternative Phone:
Cell Phone: 316–619–4785
Email: webblawyer@att.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 11680*
*Bar Status: Active*

**Katherine Elizabeth Myers**
Edelman, Liesen & Myers, LLP
208 West Linwood Blvd.
Kansas City, MO 64111
816–533–4976
Fax: 816–463–8449
Alternative Phone:
Cell Phone:
Email: kmyers@elmlawkc.com
*ATTORNEY TO BE NOTICED*
*Bar Number: 78417*
*Bar Status: Active*

V.

**Defendant**

**Wichita State University**   represented by   **Courtney Steelman**
Husch Blackwell LLP – 4801 Main
4801 Main Street, Suite 1000
Kansas City, MO 64112
816–983–8000
Fax: 816–983–8080
Alternative Phone: 816–983–8215
Cell Phone:
Email:

1

courtney.steelman@huschblackwell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 79001*
*Bar Status: Active*

**Martin M. Loring**
Husch Blackwell LLP – 4801 Main
4801 Main Street, Suite 1000
Kansas City, MO 64112
816–983–8142
Fax: 816–983–8080
Alternative Phone: 816–983–8000
Cell Phone:
Email: martin.loring@huschblackwell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 20840*
*Bar Status: Active*

**Rachel S. Kim**
Husch Blackwell LLP – 4801 Main
4801 Main Street, Suite 1000
Kansas City, MO 64112
816–983–8218
Fax: 816–983–8080
Alternative Phone:
Cell Phone:
Email: rachel.kim@huschblackwell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 79002*
*Bar Status: Active*

**Stacia G. Boden**
Wichita State University
1845 Fairmount
Wichita, KS 67260–0205
316–978–6792
Fax: 316–978–3046
Alternative Phone: 316–655–0030
Cell Phone: 316–655–0030
Email: stacia.boden@wichita.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 20295*
*Bar Status: Active*

**Timothy A. Hilton**
Husch Blackwell LLP – 4801 Main
4801 Main Street, Suite 1000
Kansas City, MO 64112

816–983–8294
Fax: 816–983–8080
Alternative Phone:
Cell Phone:
Email: tim.hilton@huschblackwell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 78327*
*Bar Status: Active*

**Defendant**

**Richard Muma**                              represented by   **Courtney Steelman**
*in his individual capacity*                                  (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*
                                                              *Bar Number: 79001*
                                                              *Bar Status: Active*

                                                              **Martin M. Loring**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*
                                                              *Bar Number: 20840*
                                                              *Bar Status: Active*

                                                              **Rachel S. Kim**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*
                                                              *Bar Number: 79002*
                                                              *Bar Status: Active*

                                                              **Stacia G. Boden**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*
                                                              *Bar Number: 20295*
                                                              *Bar Status: Active*

                                                              **Timothy A. Hilton**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*
                                                              *Bar Number: 78327*
                                                              *Bar Status: Active*

**Defendant**

**Kyoung Lee**                                represented by   **Courtney Steelman**
*in his individual capacity*                                  (See above for address)
*TERMINATED: 08/02/2022*                                      *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

*Bar Number: 79001*
*Bar Status: Active*

**Martin M. Loring**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 20840*
*Bar Status: Active*

**Rachel S. Kim**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 79002*
*Bar Status: Active*

**Stacia G. Boden**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 20295*
*Bar Status: Active*

**Timothy A. Hilton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 78327*
*Bar Status: Active*

**Defendant**

Andrew Hippisley                    represented by   **Courtney Steelman**
*in his individual capacity*                        (See above for address)
*TERMINATED: 08/02/2022*                            *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*
                                                    *Bar Number: 79001*
                                                    *Bar Status: Active*

                                                    **Martin M. Loring**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*
                                                    *Bar Number: 20840*
                                                    *Bar Status: Active*

                                                    **Rachel S. Kim**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*
                                                    *Bar Number: 79002*
                                                    *Bar Status: Active*

4

**Stacia G. Boden**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 20295*
*Bar Status: Active*

**Timothy A. Hilton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 78327*
*Bar Status: Active*

**Defendant**

**Fred Besthorn**                          represented by   **Courtney Steelman**
*in his individual capacity*                               (See above for address)
**TERMINATED: 08/02/2022**                                 *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*
                                                           *Bar Number: 79001*
                                                           *Bar Status: Active*

**Martin M. Loring**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 20840*
*Bar Status: Active*

**Rachel S. Kim**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 79002*
*Bar Status: Active*

**Stacia G. Boden**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 20295*
*Bar Status: Active*

**Timothy A. Hilton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 78327*
*Bar Status: Active*

**Defendant**

**Kaye Monk–Morgan**
*in her individual capacity*
*TERMINATED: 08/02/2022*

represented by **Courtney Steelman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 79001*
*Bar Status: Active*

**Martin M. Loring**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 20840*
*Bar Status: Active*

**Rachel S. Kim**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 79002*
*Bar Status: Active*

**Stacia G. Boden**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 20295*
*Bar Status: Active*

**Timothy A. Hilton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 78327*
*Bar Status: Active*

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 10/25/2021 | 1 | | COMPLAINT with trial location of Kansas City ( Filing fee $402, Internet Payment Receipt Number AKSDC–5619291.), filed by Karen Countryman–Roswurm. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Myers, Katherine) (Entered: 10/25/2021) |
| 10/25/2021 | 2 | | CIVIL COVER SHEET by Plaintiff Karen Countryman–Roswurm. (Myers, Katherine) (Entered: 10/25/2021) |
| 10/26/2021 | | | NOTICE OF JUDGE ASSIGNMENT: Case assigned to District Judge Holly L. Teeter and Magistrate Judge James P. O'Hara for all proceedings. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (lb) (Entered: 10/26/2021) |

| 10/26/2021 | 3 | | ORDER REASSIGNING CASE: Case reassigned to District Judge Daniel D. Crabtree for all further proceedings. District Judge Holly L. Teeter no longer assigned to case. Signed by District Judge Holly L. Teeter on 10/26/2021. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(md) (Entered: 10/26/2021) |
| 12/10/2021 | 4 | | MOTION for Extension of Time to File Answer re 1 Complaint (attorney), by Defendant Wichita State University (referred to Magistrate Judge James P. O'Hara) (Loring, Martin) (Entered: 12/10/2021) |
| 12/10/2021 | 5 | | ORDER granting, for good cause shown, 4 motion for extension of time until January 18, 2022, for defendants to answer or otherwise respond to the complaint. Signed by Magistrate Judge James P. O'Hara on 12/10/2021. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (amh) (Entered: 12/10/2021) |
| 01/13/2022 | 6 | | ENTRY OF APPEARANCE by Timothy A. Hilton on behalf of All Defendants (Hilton, Timothy) (Entered: 01/13/2022) |
| 01/18/2022 | 7 | | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Defendants Fred Besthorn, Andrew Hippisley, Kyoung Lee, Kaye Monk–Morgan, Richard Muma, Wichita State University (Hilton, Timothy) (Entered: 01/18/2022) |
| 01/18/2022 | 8 | | MEMORANDUM IN SUPPORT of 7 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Defendants Fred Besthorn, Andrew Hippisley, Kyoung Lee, Kaye Monk–Morgan, Richard Muma, Wichita State University(Hilton, Timothy) (Entered: 01/18/2022) |
| 01/26/2022 | 9 | | INITIAL ORDER SETTING SCHEDULING CONFERENCE: Scheduling Conference set for 3/30/2022 at 9:00 AM by Telephone before Magistrate Judge James P. O'Hara. Report of Parties Planning Meeting deadline 3/22/2022. Rule 26 Initial Disclosures Deadline set for 3/22/2022. All parties and counsel participating in this phone conference are directed to dial the conference center line 888–363–4749, using access code 8914911 to join the conference. Signed by Magistrate Judge James P. O'Hara on 1/26/22. (ss) (Entered: 01/26/2022) |
| 02/07/2022 | 10 | | Unopposed MOTION for Extension of Time to File Response as to 7 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Plaintiff Karen Countryman–Roswurm. (Myers, Katherine) (Entered: 02/07/2022) |
| 02/08/2022 | | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 10 Unopposed MOTION for Extension of Time to File Response as to 7 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . The motion will be resolved by the District Judge.(ss)** (Entered: 02/08/2022) |
| 02/08/2022 | 11 | | ORDER granting 10 Plaintiff's Unopposed Motion for Extension of Time to File Response to 7 Motion to Dismiss for Failure to State a Claim. Response deadline extended to 2/15/2022. Signed by District Judge Daniel D. Crabtree on 02/08/2022. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (mig) (Entered: 02/08/2022) |
| 02/15/2022 | 12 | | MEMORANDUM IN OPPOSITION by Plaintiff Karen Countryman–Roswurm re 7 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (Myers, Katherine) (Entered: 02/15/2022) |
| 02/16/2022 | 13 | | |

|  |  |  | MOTION to Continue Rule 26 Scheduling Conference *and Extension of Time to Finalize the Report of Parties Planning Meeting and Rule 26 Initial Disclosures* by Defendants Fred Besthorn, Andrew Hippisley, Kyoung Lee, Kaye Monk–Morgan, Richard Muma, Wichita State University (referred to Magistrate Judge James P. O'Hara) (Hilton, Timothy) (Entered: 02/16/2022) |
|---|---|---|---|
| 02/16/2022 | 14 |  | ORDER regarding 13 motion for extension of deadlines set in the initial scheduling order (ECF No. 9). Plaintiff has informed the undersigned that she opposes the motion and desires the full–14 day response time. To account for the time required to rule the motion, the court sue sponte modifies the initial scheduling order as follows. The Rule 26(f) conference must occur by April 11, 2022. The deadline for submission of the planning–meeting report and initial disclosures is now April 18, 2022. The telephone scheduling conference is moved to April 28, 2022, at 10:30 a.m. Signed by Magistrate Judge James P. O'Hara on 2/16/2022. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (amh) (Entered: 02/16/2022) |
| 02/24/2022 | 15 |  | ENTRY OF APPEARANCE by Stacia G. Boden on behalf of All Defendants (Boden, Stacia) (Entered: 02/24/2022) |
| 02/24/2022 | 16 |  | Unopposed MOTION for Extension of Time to File Reply as to 12 Memorandum in Opposition to 7 Motion *to Dismiss* by Defendants Fred Besthorn, Andrew Hippisley, Kyoung Lee, Kaye Monk–Morgan, Richard Muma, Wichita State University (Hilton, Timothy) (Entered: 02/24/2022) |
| 02/25/2022 |  |  | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 16 Unopposed MOTION for Extension of Time to File Reply as to 12 Memorandum in Opposition to Motion *to Dismiss*. The motion will be resolved by the District Judge.(ss)** (Entered: 02/25/2022) |
| 02/25/2022 | 17 |  | ORDER granting 16 Defendants' Unopposed Motion for Extension of Time to File Reply to 12 Memorandum in Opposition to Motion to Dismiss to 7 Motion to Dismiss for Failure to State a Claim. Reply deadline extended to 3/8/2022. Signed by District Judge Daniel D. Crabtree on 02/25/2022. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (mig) (Entered: 02/25/2022) |
| 03/01/2022 | 18 |  | RESPONSE by Plaintiff Karen Countryman–Roswurm re 13 Motion to Continue, 7 Motion to Dismiss for Failure to State a Claim (Attachments: # 1 Exhibit – Redacted 2022–02–16 T. Hilton Email)(Webb, M.) (Entered: 03/01/2022) |
| 03/04/2022 | 19 |  | MINUTE ORDER REASSIGNING CASE: Case reassigned to Magistrate Judge Angel D. Mitchell for all further proceedings. Magistrate Judge James P. O'Hara no longer assigned to case. Signed by deputy clerk on 3/4/2022. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (mam) (Entered: 03/04/2022) |
| 03/08/2022 | 20 |  | REPLY TO RESPONSE TO MOTION by Defendants Fred Besthorn, Andrew Hippisley, Kyoung Lee, Kaye Monk–Morgan, Richard Muma, Wichita State University re: 13 Motion to Continue, (Hilton, Timothy) (Entered: 03/08/2022) |
| 03/08/2022 | 21 |  | MEMORANDUM IN SUPPORT of 20 Defendants' Reply Memorandum in Support of Partial Motion to Dismiss by Defendant Wichita State University(Hilton, Timothy) Modified on 3/9/2022 to correct link (hw). |

| | | | |
|---|---|---|---|
| | | | (Entered: 03/08/2022) |
| 03/10/2022 | 22 | | NOTICE of RESCHEDULED Hearing: THIS IS AN OFFICIAL NOTICE FOR THIS HEARING (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) Scheduling Conference set for <u>4/26/2022 at 10:00 AM</u> in Telephone ADM – CONFERENCE LINE 1–888–363–4749 ACCESS CODE 3977627 before Magistrate Judge Angel D. Mitchell. (ht) (Entered: 03/10/2022) |
| 03/10/2022 | <u>23</u> | | ORDER denying <u>13</u> Defendants' Motion for Continuance and Extension of Time. The court stays discovery and related Rule 26 proceedings until the court rules on Defendants' Partial Motion to Dismiss (ECF 7). See order for further details. Signed by Magistrate Judge Angel D. Mitchell on 3/10/2022. (ht) (Entered: 03/10/2022) |
| 08/02/2022 | <u>24</u> | | MEMORANDUM AND ORDER granting in part and denying in part <u>7</u> Partial Motion to Dismiss for Failure to State a Claim. Signed by District Judge Daniel D. Crabtree on August 2, 2022. (mls) (Entered: 08/02/2022) |
| 08/11/2022 | <u>25</u> | | MOTION for Extension of Time to File Answer re <u>1</u> Complaint and Other Deadlines by Defendants Richard Muma, Wichita State University. (referred to Magistrate Judge Angel D. Mitchell) (Hilton, Timothy) Modified on 8/1/22022 – Added second motion type, re–titled and link to <u>24</u> removed. (mam) (Entered: 08/11/2022) |
| 08/12/2022 | 26 | | ORDER granting in part and taking under advisement in part <u>25</u> Defendants' Motion for Extended Responsive Pleading and Other Deadlines. The motion is granted to the extent that Defendants shall now have until August 26, 2022, to answer or otherwise respond to the complaint. As to the remainder of the motion, the response deadline is expedited to August 17, 2022, and the reply deadline is expedited to August 19, 2022. Signed by Magistrate Judge Angel D. Mitchell on 8/12/2022. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (amh) (Entered: 08/12/2022) |
| 08/16/2022 | <u>27</u> | | MOTION to Stay Discovery *Pending Interlocutory Appeal* by Defendant Wichita State University (referred to Magistrate Judge Angel D. Mitchell) (Hilton, Timothy) (Entered: 08/16/2022) |
| 08/16/2022 | <u>28</u> | | RESPONSE by Plaintiff Karen Countryman–Roswurm re <u>25</u> Motion for Extension of Time to File Answer, (Webb, M.) (Entered: 08/16/2022) |
| 08/19/2022 | <u>29</u> | | REPLY *Defendants' Reply in Support of Their Motion for Extended Responsive Pleading and Other Deadlines* by Defendants Richard Muma, Wichita State University. (Hilton, Timothy) (Entered: 08/19/2022) |
| 08/22/2022 | 30 | | ORDER denying as moot in part <u>25</u> Defendants' Motion for Extended Responsive Pleading and Other Deadlines. On August 12, 2022, the court granted the motion to the extent defendants requested an extension of time to answer the complaint, but took under advisement defendants' request to extend other deadlines. Defendants' reply (ECF 29) states that their Motion to Extend the Stay Pending Interlocutory Appeal (ECF 27) has rendered the remaining portion of this motion moot. Signed by Magistrate Judge Angel D. Mitchell on 8/22/2022. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ht) (Entered: 08/22/2022) |

| 08/22/2022 | 31 | | NOTICE OF APPEAL by Defendant Richard Muma. Filing fee $505, Internet Payment Receipt Number AKSDC−5850267. (Kim, Rachel) Modified on 8/22/2022 to remove Wichita State University as a filer. (mam) (Entered: 08/22/2022) |

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

KAREN COUNTRYMAN-ROSWURM,    )
    )
               Plaintiff,    )
    )
v.    )       Case No. 21-cv-02489
    )
WICHITA STATE UNIVERSITY, ET AL.,    )
    )
              Defendants    )

### DEFENDANT RICHARD MUMA'S NOTICE OF APPEAL

Pursuant to Federal Rule of Appellate Procedure 3(a)(1), **Defendant Richard Muma** ("Dr. Muma") hereby appeals to the **United States Court of Appeals for the Tenth Circuit** from the **District Court's Memorandum and Order (ECF No. 24) dated August 2, 2022**, denying Dr. Muma qualified immunity.[1]

Respectfully Submitted,

*/s/ Rachel S. Kim*
Martin M. Loring, KS Bar No. 20840
Timothy A. Hilton, # 78327
Courtney Steelman, #79001
Rachel S. Kim, #79002
Husch Blackwell LLP
4801 Main Street, Suite 1000
Kansas City, Missouri 64112
Telephone: 816-983-8000
Facsimile: 816-983-8080
Martin.loring@huschblackwell.com
Tim.hilton@huschblackwell.com
Courtney.steelman@huschblackwell.com
Rachel.kim@huschblackwell.com
**ATTORNEYS FOR DEFENDANTS WICHITA STATE UNIVERSITY AND RICHARD MUMA**

---

[1] The district court's denial of qualified immunity is an immediately appealable final decision within the meaning of 28 U.S.C. §1291. *Behrens v. Pelletier*, 516 U.S. 299, 306 (1996).

HB 4895-7837-5727

1

## CERTIFICATE OF SERVICE

This is to certify that on the 22nd day of August 2022, the above and foregoing was electronically filed via the Court ECF filing system, which will provide notice of the same to all counsel of record.

/s/  Rachel S. Kim

**Attorney for Defendants**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| KAREN COUNTRYMAN-ROSWURM, | |
| Plaintiff, | |
| v. | Case No. 21-2489-DDC-ADM |
| WICHITA STATE UNIVERSITY, et al., | |
| Defendants. | |

## MEMORANDUM AND ORDER

Plaintiff Karen Countryman-Roswurm is a self-described Native American, Christian woman. She's a professor at defendant Wichita State University (WSU). In 2013, WSU offered plaintiff a unique opportunity to serve in two roles: one as a social work professor, the other as director of a newly established Center for Combating Human Trafficking (CCHT). Plaintiff's unique split-appointment angered one of her fellow professors—a man who works in the social work department. That professor then told everyone in the department that plaintiff traded sexual favors with WSU administrators in exchange for her new job. Plaintiff alleges these rumors persisted for years, creating a culture of harassment, and damaging her reputation at WSU. In response, plaintiff contends, WSU not only ignored the harassment, but actively perpetuated it. Eventually, WSU removed plaintiff as CCHT director and later closed the center.

Plaintiff brings this lawsuit against WSU and several of its administrators and employees. She asserts 27 claims for retaliation, harassment, and discrimination because of sex, race, and religion under Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, and the Kansas Act Against Discrimination. She also alleges constitutional violations under 42 U.S.C. § 1983 against individual defendants Fred Besthorn, Kyoung Lee, Andrew

Hippisley, Richard Muma, and Kaye Monk-Morgan.  Seeking a "serious winnowing" of the

Complaint, defendants move to dismiss 23 of plaintiff's 27 claims, thus narrowing the case to

four claims.  *See* Doc. 7; Doc. 8 at 8.  The court grants in part and denies in part defendants'

motion.  The court explains this ruling, below.

## I.    Background

The court draws the following relevant facts from the Complaint (Doc. 1).  As it must at

this stage, the court accepts plaintiff's "well-pleaded facts as true, view[s] them in the light most

favorable to [her], and draw[s] all reasonable inferences from the facts" in her favor.  *Brooks v.*

*Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021).

Plaintiff is a Native American, Christian woman.  Doc. 1 at 5 (Compl. ¶¶ 28–30).  In

2010, she began her employment at WSU.  *Id.* (Compl. ¶ 31).  By 2013, she was a full-time,

tenure-track assistant professor in the School of Social Work, part of WSU's College of Liberal

Arts.  *Id.* (Compl. ¶ 32).  That year, then-WSU Dean Ron Matson suggested plaintiff open a

facility at WSU, focusing on her work combating human trafficking.  *Id.* (Compl. ¶ 33).

Working in tandem with WSU, plaintiff then established the Center for Combating Human

Trafficking (CCHT) at WSU and became its executive director.  *Id.* at 6 (Compl. ¶ 34).  Plaintiff

and WSU then entered a "split-appointment" agreement, where plaintiff would serve "in

separate, but complimentary, roles as a professor in the School of Social Work and as the

Executive Director of the CCHT."  *Id.* (Compl. ¶¶ 36–39).  WSU agreed to fund plaintiff's salary

in both roles, with the possibility for additional compensation.  *Id.* (Compl. ¶¶ 40–41).  And,

WSU agreed to provide plaintiff a graduate research assistant at the CCHT.  *Id.* (Compl. ¶ 42).

But that's when the trouble began.  Shortly after plaintiff opened the CCHT in 2013, she

learned from Dean Matson that Dr. Fred Besthorn (one of this case's defendants) wasn't happy

2

with plaintiff's split-appointment. *See id.* at 7 (Compl. ¶¶ 44–45.). Dr. Besthorn was a tenured professor and Committee Chair in the School of Social Work. *Id.* (Compl. ¶ 45). In that role, he supervised plaintiff, annually evaluated her performance, and voted whether WSU would re-appoint her each year. *Id.* (Compl. ¶ 46). According to Dean Matson, Dr. Besthorn had made several comments to him about plaintiff's split-appointment, like "What is she doing to get these special privileges?" and "Whose cock did she suck?" *Id.* (Compl. ¶ 47) (internal quotations omitted). Dr. Besthorn apparently believed that plaintiff had provided sexual favors for Dean Matson and then-Provost Keith Pickus in exchange for the CCHT. *Id.* (Compl. ¶ 48). Plaintiff told Dean Matson that she found the comments concerning and embarrassing. *Id.* at 8 (Compl. ¶ 51). But Dean Matson laughed the comments away. *See id.* at 7 (Compl. ¶¶ 49–50).

These comments weren't a joke. Dr. Besthorn and other professors continued to tell Dean Matson that "it was obvious" plaintiff was performing sexual favors in exchange for her split-appointment because "there was no other reason" why WSU would allow that "young girl" to open her own center at the university. *Id.* at 8 (Compl. ¶ 53). The professors demanded a department-wide meeting without plaintiff to discuss her position in the department. *Id.* (Compl. ¶ 54). When plaintiff learned about this demand, she asked to join the meeting to send a "clear message" that the "rumors were not true" and that the professors must stop their harassment. *Id.* (Compl. ¶ 55). Ultimately, Dean Matson didn't allow the meeting to take place. *Id.* (Compl. ¶ 56).

Dr. Besthorn then confronted plaintiff personally. On campus, and in students' presence, Dr. Besthorn "loudly berated" plaintiff and accused her of exchanging sexual acts for her position with the CCHT. *Id.* at 8–9 (Compl. ¶¶ 59–60). "[Y]oung girl," he said, "you are clearly sucking somebody's dick" to get such a "unique split appointment." *Id.* at 9 (Compl. ¶ 60)

3

(internal quotations omitted). Then—again in the presence of students—Dr. Besthorn specifically accused her of having sex with Dean Matson and Provost Pickus to get her job with the CCHT. *Id.* Plaintiff reported this encounter to Dean Matson and Provost Pickus. *Id.* (Compl. ¶ 61). But they told her "to move on and not make a big deal of it." *Id.*

Dr. Besthorn's comments continued for years. Plaintiff alleges that Dr. Besthorn told several WSU employees, including at department-wide meetings, that plaintiff got her split-appointment position because she had sex with her supervisors. *Id.* at 9–11 (Compl. ¶¶ 62, 71, 77–78). Dr. Besthorn asked Dean Matson whether plaintiff had sex with him to get her job. *Id.* at 11 (Compl. ¶ 80). He allegedly told his colleagues that plaintiff had "worked an Indian deal" to secure her split-appointment. *Id.* at 9, 15 (Compl. ¶¶ 67, 110). And, plaintiff alleges, Dr. Besthorn's beliefs began to spread through the department. At one department-wide meeting, another professor questioned whether plaintiff "used those hoe boots on Dr. Matson and Dr. Pickus." *Id.* at 10 (Compl. ¶ 75) (quotation cleaned up).

Dr. Besthorn also continued to confront plaintiff personally. One time, he called her into his office and told her "not to publish papers alongside students." *Id.* at 9 (Compl. ¶ 63). When plaintiff resisted his suggestion, Dr. Besthorn accused her of "using her sexuality to keep her job." *Id.* (Compl. ¶ 64). He said, "Native women are known for trading sex to get what they want." *Id.* (Compl. ¶ 65) (internal quotations omitted). He also told her "Indian women have been known to serve a purpose to white men." *Id.* (Compl. ¶ 66) (internal quotations omitted); *see also id.* at 11 (Compl. ¶ 78) (alleging that Dr. Besthorn told a co-worker the same thing about plaintiff). For the next several years, Dr. Besthorn frequently told plaintiff that she seemed to have special relationships with WSU administrators that guaranteed her special treatment. *Id.* at 10 (Compl. ¶ 68). He repeatedly insinuated that plaintiff traded sexual acts for her job, telling

4

her directly, "there's no other way you would have your job."  *Id.* (Compl. ¶ 73) (internal quotations omitted).  He began calling her a "one trick pony" to her face and in department meetings.  *Id.* (Compl. ¶¶ 68, 71–72) (internal quotations omitted).

Dr. Besthorn also demeaned plaintiff's work at the CCHT.  He told her once that human trafficking survivors "were just 'choosing sex work'" and that plaintiff wasn't a real social worker.  *Id.* (Compl. ¶ 70).  He called plaintiff's anti-trafficking work "religious rhetoric[.]"  *Id.* (Compl. ¶ 69).  He also called her a "crazy Christian."  *Id.* ("I see you and your husband are doing a lot of work with that church he is pastoring . . . there is more than just your anti-sex perspective[.]" (internal quotations omitted)).  Over time, plaintiff learned from several students that Dr. Besthorn and other social work professors had discouraged them from working with the CCHT, studying human trafficking, or even interacting with plaintiff.  *Id.* at 15 (Compl. ¶¶ 112–13).  Dr. Besthorn allegedly told several students that human sex trafficking "is really just people choosing to participate in 'sex work,' that human trafficking is not a valid social work issue, that human trafficking is not typically real and women are covering up choices they regret, that the reality of human trafficking is exaggerated, [and] that the money spent to address these issues is not put to good use[.]"  *Id.* (Compl. ¶ 114).  Consistent with this view, from 2016 to 2020, Dr. Besthorn—who was responsible for appointing social work teaching assistants—denied the CCHT a graduate research assistant.  *See id.* at 16 (Compl. ¶¶ 117–18).

Plaintiff reported Dr. Besthorn's conduct to several supervisors over the years.  *See id.* at 11 (Compl. ¶ 81).  At one point, Dean Matson told plaintiff to stop attending department-wide meetings to avoid Dr. Besthorn and other professors' harassing comments.  *Id.* at 10 (Compl. ¶ 76).  At another, Dean Matson and Dr. Pickus responded to plaintiff's complaints by saying "they felt the rumors [about them and plaintiff] were a compliment to them."  *Id.* at 12 (Compl. ¶

5

85).  And, despite acknowledging Dr. Besthorn's harassment, as well as a "history of similar problems in the Department[,]" Dean Matson discouraged plaintiff from reporting the harassment to anyone else because it could negatively affect her tenure prospects.  *Id.* at 11 (Compl. ¶¶ 83–84).  Nevertheless, plaintiff reported the harassment to Dr. Brien Bolin, then-Chair of the Social Work Department.  *Id.* at 12 (Compl. ¶¶ 87–88).  Dr. Bolin responded that he couldn't do anything about Dr. Besthorn's comments.  *Id.* (Compl. ¶ 89).  He speculated that plaintiff's success as a "younger woman" made Dr. Besthorn angry.  *Id.* (internal quotations omitted).  And so, he suggested, "Dr. Besthorn would probably stop harassing [plaintiff] if [she] would stop making him so jealous[.]"  *Id.* (internal quotations omitted).

Starting in 2014, Dr. Besthorn began wielding his supervisory authority against plaintiff. Along with fellow professor and defendant Dr. Kyoung Lee, Dr. Besthorn submitted a negative 2014 performance review for plaintiff.  *Id.* (Compl. ¶ 92).  Plaintiff rebutted this negative review with Dr. Bolin in early 2015.  *Id.* at 13 (Compl. ¶ 96).  Dr. Bolin directed plaintiff to "tone down" her accomplishments because they "upset the men" in the department.  *Id.* (Compl. ¶¶ 97–98) (internal quotations omitted).  In another 2015 meeting with both Dr. Bolin and Dean Matson about the ongoing harassment, Dr. Bolin again encouraged plaintiff to water down her accomplishments.  *Id.* at 14 (Compl. ¶ 104).  He suggested that plaintiff include Dr. Besthorn's and Dr. Lee's names on her publications, grants, and contracts.  *Id.*  Dean Matson also "excuse[d] the rumors" about plaintiff because he "understood" that plaintiff was "young and pretty."  *Id.* (Compl. ¶ 102) (internal quotations omitted).  Ultimately, Dean Matson and Dr. Bolin concluded that plaintiff "was backed into a corner[.]"  *Id.* (Compl. ¶ 105).  But they didn't do anything about it.

The next year, 2015, Dr. Besthorn and Dr. Lee negatively evaluated plaintiff's performance again. *Id.* (Compl. ¶ 106). Dr. Besthorn also voted against plaintiff's re-appointment for the next year. *Id.* (Compl. ¶ 107). Plaintiff responded to the negative review, saying she felt unsafe because of hostility in the department. *Id.* (Compl. ¶ 108). Then, the year after—2016—Dr. Besthorn and Dr. Lee concluded that plaintiff had met expectations for the year, but nevertheless voted against her re-appointment. *Id.* at 16 (Compl. ¶¶ 120–21). In a final blow, Dr. Besthorn and Dr. Lee sat on a three-member committee evaluating plaintiff's tenure application in 2018. *Id.* at 18 (Compl. ¶¶ 137–39). They both voted against tenure, while the third committee member voted for plaintiff. *Id.* at 18–19 (Compl. ¶¶ 140–41). Dr. Besthorn wrote an addendum to the committee's decision, explaining why he believed plaintiff didn't deserve tenure. *Id.* at 19 (Compl. ¶¶ 142–43). But, other committees (who apparently had the last word) granted plaintiff tenure and promoted her. *Id.* (Compl. ¶ 145). The faculty of the Social Work Department didn't celebrate plaintiff's tenure, as they previously had done for other members. *Id.* (Compl. ¶ 146).

Plaintiff continuously reported Dr. Besthorn's harassment to WSU administrators over the years. *See, e.g.*, *id.* at 11–12, 13, 15, 18 (Compl. ¶¶ 81–90, 100, 115, 136). But the administrators, including Dean Matson, discouraged plaintiff from filing formal complaints until she achieved tenure. *See, e.g.*, *id.* at 11, 15, 18 (Compl. ¶¶ 83, 116, 136).

In 2018, the personnel at WSU changed. Defendant Andrew Hippisley replaced Dr. Matson as Dean of the College of Liberal Arts after Dr. Matson's retirement. *Id.* at 20 (Compl. ¶ 155). Dr. Bolin became Associate Dean. *Id.* (Compl. ¶ 157). And Dr. Besthorn became Social Work Department Chair. *Id.* Plaintiff met with the new Dean Hippisley twice in the fall of 2018 about the harassment she had endured over the years. She told him that some people in the

7

department believed she had exchanged sexual acts for her job. *Id.* at 21 (Compl. ¶¶ 159–60, 162–63). In both meetings, Dean Hippisley responded that he had heard "concerns" from others in the department about plaintiff's job and compensation. *Id.* (Compl. ¶¶ 159, 162) (internal quotations omitted). He told her that her colleagues' conduct ultimately didn't matter because plaintiff had secured tenure, and so, WSU couldn't fire her. *Id.* (Compl. ¶ 164). And, he added, plaintiff "was 'lucky' to have her job and salary 'as a woman' so early in her career" and so, she should stop complaining about harassment and discrimination. *Id.* at 22 (Compl. ¶ 167).

After these meetings, plaintiff alleges Dean Hippisley retaliated against her in several ways. He repeatedly denied her requests for additional compensation. *Id.* at 22–23 (Compl. ¶¶ 175–77). He denied her request to attend a professional conference. *Id.* at 23 (Compl. ¶ 182). And, (while plaintiff doesn't allege specifically who made the decision), WSU moved the CCHT's offices from WSU's downtown location to the second floor of the College of Liberal Arts and Sciences building—just down the hallway from Dean Hippisley. *Id.* (Compl. ¶ 178–79). Plaintiff alleges that "moving office spaces is a known form of retaliation at WSU." *Id.* (Compl. ¶ 181). In response, plaintiff filed a formal complaint with WSU's Office of Institutional Equity and Compliance (OIEC) in December 2018. *Id.* (Compl. ¶ 183). Plaintiff specifically named Dean Hippisley, Dr. Besthorn, Dr. Bolin, and Dr. Lee in her OIEC complaint. *Id.* at 24 (Compl. ¶ 189). After an interview in January 2019, the OIEC decided not to investigate plaintiff's complaint. *Id.* (Compl. ¶¶ 188–90). The OIEC informed Dean Hippisley, Dr. Besthorn, Dr. Bolin, and Dr. Lee of its decision. *Id.* (Compl. ¶ 192).

Plaintiff alleges that, immediately after she filed her OIEC complaint, Dean Hippisley further retaliated against her. He told her she was a "'Russian doll'" in his department, and that she was "'lucky' to have the job she had 'as a woman.'" *Id.* at 25 (Compl. ¶ 195). He blocked

8

her from choosing the courses she taught, as she had done previously and as other professors still did. *Id.* at 29 (Compl. ¶¶ 231–33). Dean Hippisley mandated that all communications between plaintiff and the Social Work Department filter through him first. *Id.* at 24 (Compl. ¶ 186). He told plaintiff he no longer would answer her questions via email. *Id.* (Compl. ¶ 187). He denied another request for additional compensation in February 2019. *Id.* at 25 (Compl. ¶ 198). And, around the same time, he denied plaintiff's request to attend an invitation-only conference in Ireland, even though a CCHT donor had funded the trip. *Id.* (Compl. ¶¶ 199–200). Calling the conference a "spa trip[,]" Dean Hippisley denied plaintiff access to the donor's funds and denied her vacation request to attend the conference. *Id.* (Compl. ¶¶ 201–03). WSU eventually returned the funds to the CCHT donor, which plaintiff alleges was "unheard of[.]" *Id.* at 26 (Compl. ¶¶ 206–07). Around the same time, plaintiff also received a negative performance review for 2018 from Dean Hippisley, "the sole evaluator of [her] CCHT position." *Id.* (Compl. ¶¶ 211–12). And, she continued to receive negative performance reviews from Dr. Besthorn, who was now "the sole evaluator of [her] Social Work position[.]" *Id.*

Shortly after receiving the negative reviews, plaintiff sought help from defendant Dr. Richard Muma, then-Provost and WSU Acting President in February 2019. *Id.* at 27 (Compl. ¶ 215). She expressed her belief that her negative reviews resulted from the years-long harassment she had endured at WSU. *Id.* (Compl. ¶¶ 216–17). Dr. Muma committed that WSU would continue to abide by its employment agreement with plaintiff. *Id.* (Compl. ¶¶ 218–19). But, he cautioned, plaintiff should "set [her harassment complaints] aside moving forward." *Id.* at 28 (Compl. ¶ 221). He told her "it's gonna be better for you if you can do that . . . . You're gonna have to let go of it." *Id.* And while he acknowledged he had received harassment complaints from others about Dr. Besthorn, he "clearly articulated" that WSU wouldn't resolve plaintiff's

9

complaints.  *Id.* (Compl. ¶¶ 224–25).  He also "suggested that he believed [p]laintiff had been having a sexual relationship with Dr. Matson."  *Id.* (Compl. ¶ 223).  Sometime later, he emailed plaintiff that "should she continue to assert" her harassment complaints, WSU could consider her comments "defamatory."  *Id.* (Compl. ¶ 226).

A few months later, in May 2019, plaintiff again met with Dean Hippisley about Dr. Besthorn's ongoing harassment.  *Id.* at 29–30 (Compl. ¶¶ 234–36).  Dean Hippisley took no action.  *Id.* at 30 (Compl. ¶ 237).  Around the same time, plaintiff alleges that Dr. Besthorn broke into her office, placed signs on her furniture claiming ownership for himself, and knocked several items off plaintiff's desk, including two glass items that she later found broken on the floor.  *Id.* (Compl. ¶¶ 238–39).  When plaintiff reported the break-in to Dean Hippisley, he dismissed it, telling her to report her claims to the OIEC.  *Id.* (Compl. ¶ 240).  But, when plaintiff reported the break-in to the OIEC, it directed her back to Dean Hippisley.  *Id.* (Compl. ¶ 241).  The OIEC concluded the alleged break-in was "a personnel issue[.]"  *Id.*  In August 2019, plaintiff met with Dr. Lee about the harassment.  *Id.* at 31 (Compl. ¶ 250).  He told her he didn't "have time to deal with the conflicts."  *Id.* (Compl. ¶ 251) (internal quotations omitted).  Around the same time, plaintiff emailed then-Interim President Andrew Tompkins about her complaints.  *Id.* (Compl. ¶ 253).  He forwarded plaintiff's email to the OIEC, which finally investigated the harassment.  *Id.* at 32 (Compl. ¶ 254).

But, plaintiff alleges, OIEC's fall 2019 investigation was woefully inadequate.  In her view, an OIEC investigator refused to look at her during an interview, responded aggressively to plaintiff's questions and statements, and insinuated his belief that she was lying about her complaints.  *Id.* (Compl. ¶ 256).  Plaintiff further alleges that the OIEC "manipulated and disregarded information" corroborating her complaints.  *Id.* (Compl. ¶¶ 258, 261).  Specifically,

she highlights one example of a witness statement corroborating Dr. Besthorn's comments that plaintiff slept with someone to get her job. *Id.* (Compl. ¶ 259). Plaintiff alleges that the OIEC investigator called Dr. Besthorn's comments "locker room talk." *Id.* (internal quotations omitted). Ultimately, the OIEC didn't find in plaintiff's favor. *See id.* at 32, 35 (Compl. ¶¶ 261, 286–87).

During the OIEC's investigation, plaintiff alleges that WSU began a push to close the CCHT. In August 2019, WSU fired plaintiff's husband in his role as CCHT finance director. *Id.* at 31 (Compl. ¶ 244). WSU provided no reason for his firing. *Id.* (Compl. ¶ 245). In September 2019, Interim President Tompkins talked with plaintiff about moving the CCHT off campus. *Id.* at 32 (Compl. ¶ 262). That same month, WSU instructed College of Liberal Arts employees to stop communicating with the CCHT. *See id.* at 35 (Compl. ¶ 285). Also in September 2019, plaintiff met with Dr. Muma and other administrators about the CCHT's future. *Id.* at 34 (Compl. ¶ 279). At that meeting, Dr. Muma asked plaintiff to sign a non-disclosure agreement, but she refused. *Id.* at 34–35 (Compl. ¶¶ 280–83). Just a few months later, in November 2019, plaintiff again complained to Dr. Muma about harassment. *Id.* at 35 (Compl. ¶ 288). Around the same time, WSU informed plaintiff it was ending her employment as the CCHT's Executive Director, effective June 2020. *Id.* (Compl. ¶¶ 289–90). This decision would leave plaintiff with a half-time teaching role and half the salary she had earned before. *Id.* (Compl. ¶ 291). Despite plaintiff's requests, WSU made no effort to place her in a full-time teaching role. *Id.* (Compl. ¶ 292).

Plaintiff alleges more events after the fall of 2019. During that semester, several students had reported to her that Dr. Besthorn had belittled domestic violence, human trafficking survivors, and anyone who researched these topics. *Id.* at 36 (Compl. ¶ 296). One student

11

reported that Dr. Besthorn had called plaintiff a "crazy prostitute." *Id.* (Compl. ¶ 297) (internal quotations omitted). Plaintiff encouraged these students to report their concerns to the OIEC. *Id.* (Compl. ¶¶ 298–99). Plaintiff herself also reported the students' concerns, as well as her own, to the OIEC. *Id.* (Compl. ¶ 300). The next semester, in early 2020, plaintiff received a formal write-up for encouraging students to report to the OIEC. *Id.* at 37 (Compl. ¶ 301). While not entirely clear, plaintiff also alleges an episode in spring 2020 where students complained about Dr. Besthorn to WSU administrators, and, in response, Dean Hippisley and Dr. Lee forced students to meet with them and questioned whether plaintiff was involved in the students' complaints. *Id.* (Compl. ¶¶ 302–06).

Throughout 2020, plaintiff continued to report ongoing harassment to Kansas Board of Regent Jon Rolph and then-WSU President Jay Golden. *Id.* at 38 (Compl. ¶¶ 314–15). Plaintiff alleges that, in response, she was isolated and displaced from any meaningful supervision or support at WSU. *See id.* at 38–39 (Compl. ¶¶ 316, 324). Dr. Lee gave plaintiff a negative review for 2019. *Id.* at 39 (Compl. ¶ 319). At a meeting to discuss the review, Dr. Lee laughed at plaintiff for "being Native American." *Id.* (Compl. ¶ 321). He told her she needed to "'ask nicely' for things and have a 'good attitude[.]'" *Id.* (Compl. ¶ 322). He also "strongly implied" that plaintiff should leave her employment with WSU if she wasn't happy there. *Id.* (Compl. ¶ 323).

In the summer of 2020, defendant Kaye Monk-Morgan took over as the CCHT's director. *Id.* (Compl. ¶ 324). Ms. Monk-Morgan also served as WSU's Interim Vice President for Regional Engagement and Economic Development at that time. *Id.* Plaintiff alleges that Ms. Monk-Morgan harbored discriminatory beliefs against her. Specifically, she alleges Ms. Monk-Morgan "made a derogatory race-based comment" about plaintiff during the OIEC's

investigation into plaintiff's complaints. *Id.* at 40 (Compl. ¶ 328). Plaintiff alleges, without context, that Ms. Monk-Morgan told investigators that plaintiff doesn't "get to tell me, as a white woman, what to do with whatever social capital I have." *Id.* (Compl. ¶ 328). In July 2020, plaintiff confronted Ms. Monk-Morgan about her comments. *Id.* (Compl. ¶¶ 331–32). Later, Ms. Monk-Morgan informed plaintiff that WSU would no longer fund her position at the CCHT. *Id.* (Compl. ¶ 333). But, she assured plaintiff, plaintiff's overall salary wouldn't change. *Id.* (Compl. ¶ 335).

Sometime in the summer or fall of 2020, WSU decided to close to the CCHT. During that time, WSU asked plaintiff to participate in a "communications plan" to announce the CCHT's closure. *Id.* at 41 (Compl. ¶ 339). Plaintiff refused. *Id.* (Compl. ¶ 340). Then, in September 2020, WSU told multiple CCHT donors that plaintiff had decided to close the CCHT. *Id.* (Compl. ¶¶ 342–44). Plaintiff alleges she made no such decision, and that WSU closed the CCHT against her will. *Id.* at 41–42 (Compl. ¶¶ 342–44, 349–50). Later that month, WSU significantly reduced plaintiff's salary. *Id.* at 41 (Compl. ¶ 336). Just a few days later, it closed the CCHT. *Id.* at 42 (Compl. ¶ 351). And, a month after that, WSU reduced plaintiff's appointment term from 12 months to 9 months. *Id.* (Compl. ¶ 352).

Plaintiff dually filed a Charge of Discrimination with the Kansas Human Rights Commission and the EEOC on January 16, 2020. *Id.* at 38 (Compl. ¶ 313); *see also* Doc. 1-1 (Charge). She filed an Amended Charge expanding her claims on December 11, 2020. *See generally* Doc. 1-3. The EEOC sent her a Notice of Right to Sue on October 14, 2021. *See* Doc. 1-4. Plaintiff timely filed her Complaint in our court on October 25, 2021.

## II.    Legal Standard

Fed. R. Civ. P. 12(b)(6) allows a party to move to dismiss an action for failing "to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  For a complaint to survive a Rule 12(b)(6) motion to dismiss, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

When considering a Rule 12(b)(6) motion to dismiss, the court must assume that the factual allegations in the complaint are true, but it is "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  And, while this pleading standard doesn't require "'detailed factual allegations,'" it demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, the Supreme Court has explained, "'will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).

## III.    Analysis

Plaintiff brings 27 claims against six defendants.  Seeking a "serious winnowing" of the Complaint, defendants move to dismiss 23 of those claims.  Doc. 8 at 8.  Defendants place those claims—and their arguments for dismissal—into four boxes:  (1) claims against WSU under the Kansas Act Against Discrimination (KAAD); (2) § 1983 claims against the individual

defendants; (3) Title VII race and religion discrimination claims against WSU; and (4) all of plaintiff's Title IX claims against WSU. The court agrees with most of defendants' arguments— but there are a few key exceptions. Plaintiff has alleged a plausible Title VII racial harassment claim against WSU and a plausible § 1983 claim against defendant Muma. She's also plausibly alleged all her Title IX claims. So, those claims can proceed. But the court grants the balance of defendants' Partial Motion to Dismiss. The court explains its various conclusions in more detail, below.

### A. KAAD Claims

Defendants first argue that Eleventh Amendment immunity bars plaintiff's KAAD claims against WSU, a state entity. *See Billings v. Wichita State Univ.*, 557 F. Supp. 1348, 1350 (D. Kan. 1983) ("It is . . . well established that the universities established by the State of Kansas and governed by the Kansas Board of Regents function as alter ego agencies of the state and share its Eleventh Amendment immunities." (citing *Brennan v. Univ. of Kan.*, 451 F.2d 1287, 1290–91 (10th Cir. 1971)); *see also id.* at 1351 (applying Eleventh Amendment immunity to KAAD claims asserted against defendant Wichita State University).

Plaintiff's only response to this immunity is an argument that Kansas has waived its sovereign immunity for KAAD claims. But plaintiff confuses Kansas's sovereign immunity waiver in its own state courts with Eleventh Amendment immunity. The Eleventh Amendment generally bars suits against states and their agencies in *federal court. Levy v. Kan. Dep't of Soc. & Rehab. Servs.*, 789 F.3d 1164, 1168 (10th Cir. 2015) ("'The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court.'" (quoting *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001))); *see also Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1212 (10th Cir. 2019) ("Once effectively

asserted, Eleventh Amendment immunity constitutes a bar to the exercise of federal subject matter jurisdiction." (quotation cleaned up)).  Our court recognized years ago that, while "Kansas has waived its *sovereign* immunity for claims brought under the KAAD, . . . that waiver does not amount to a waiver of Kansas'[s] *Eleventh Amendment* immunity."  *Ballou v. Univ. of Kan. Med. Ctr.*, 871 F. Supp. 1384, 1391 (D. Kan. 1994).  That's because a "State does not waive its Eleventh Amendment immunity by consenting to suit only in its own courts[.]"  *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 306 (1990); *see also Harris v. Okla. Off. of Juv. Affs. ex rel. Cent. Okla. Juv. Ctr.*, 519 F. App'x 978, 980 (10th Cir. 2013) (reiterating differences between state sovereign immunity in a state's own courts and Eleventh Amendment immunity from suit in federal court).

Plaintiff provides no authority holding or even suggesting that Kansas has waived its Eleventh Amendment immunity against KAAD claims in federal court.  And the court finds no such authority.  Eleventh Amendment immunity bars plaintiff's KAAD claims against WSU for sex discrimination (Count XV), sexual harassment (Count XVI), race discrimination (Count XVII), racial harassment (Count XVIII), religious discrimination (Count XIX), religious harassment (Count XX), retaliation (Count XXI), and retaliatory harassment (Count XXII).  The court dismisses those claims—but without prejudice—because it lacks subject matter jurisdiction over them.  *Colby v. Herrick*, 849 F.3d 1273, 1278 (10th Cir. 2017) ("Because Eleventh Amendment immunity is jurisdictional, this dismissal should have been without prejudice.").

### B.    § 1983 Claims Against Individual Defendants

A defendant is liable under 42 U.S.C. § 1983 if, under color of state law, the defendant deprives a person of a constitutional right.  Plaintiff brings § 1983 claims against five defendants in their individual capacities.  Against defendants Besthorn and Monk-Morgan, plaintiff asserts a

procedural due process claim for alleged defamatory statements. Against defendants Muma, Hippisley, and Lee, plaintiff asserts an equal protection claim for ignoring her repeated harassment complaints. All five defendants, as state employees, assert qualified immunity. So, for these claims to survive, plaintiff must show: "(1) that the [defendant] violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The court first addresses the claims against defendants Besthorn and Monk-Morgan. Then, it turns to plaintiff's claims against defendants Muma, Hippisley, and Lee.

### 1. Procedural Due Process Claims Against Defendants Besthorn and Monk-Morgan

A state official deprives a plaintiff of her liberty interest without due process of law when the official makes a defamatory statement about the plaintiff and that statement in some way alters plaintiff's legal status. *Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011) (citing *Paul v. Davis*, 424 U.S. 693 (1976)). The alleged deprivation of a plaintiff's liberty interest in her reputation and the resulting change in legal status is known as a "stigma-plus" claim. *See, e.g.*, *Guttman v. Khalsa*, 669 F.3d 1101, 1125–26 (10th Cir. 2012). In the context of public employment, the Tenth Circuit has held that an employee acquires an actionable stigma-plus claim when a governmental supervisor defames the employee during the course of termination, foreclosing other employment opportunities. *McDonald v. Wise*, 769 F.3d 1202, 1212 (10th Cir. 2014) (citing *Workman v. Jordan*, 32 F.3d 475, 480 (10th Cir. 1994)).

Thus, to state a stigma-plus claim, plaintiff must allege facts capable of supporting four elements: "(1) [the government employer] makes a statement that 'impugn[s] the good name, reputation, honor, or integrity of the employee'; (2) the statement is false; (3) the statement is made during the course of termination and 'foreclose[s] other employment opportunities'; and

17

(4) the statement is published, in other words disclosed public[ly]." *Id.* (quoting *Workman*, 32 F.3d at 481) (footnotes and emphasis omitted).  While plaintiff's stigma-plus claims against defendants Besthorn and Monk-Muma rely on distinct factual allegations, the claims ultimately meet the same fate:  plaintiff has failed to allege facts capable of supporting an inference or finding of at least one element of each claim.  The court explains its conclusions about each claim separately, below.

### a.  Defendant Besthorn

Plaintiff alleges Dr. Besthorn made several false statements that "'impugn[ed] [her] good name, reputation, honor, or integrity[.]'"  *McDonald*, 769 F.3d at 1212 (quoting *Workman*, 32 F.3d at 481).  A simple scan through Dr. Besthorn's many alleged statements that plaintiff traded sexual favors for her job confirms that plaintiff easily has met the first element of a stigma-plus claim.  Plaintiff has alleged that Dr. Besthorn's comments were false, satisfying the second element.  And, she's satisfied the fourth element by alleging that Dr. Besthorn defamed her publicly in front of students, when he "loudly berated" her on campus and said, "young girl . . . you are clearly sucking somebody's dick" to get such a "unique split appointment" at WSU. Doc. 1 at 8–9 (Compl. ¶¶ 59–60); *see also id.* at 36 (Compl. ¶ 297) (alleging that a student reported to plaintiff that Dr. Besthorn had called plaintiff a "crazy prostitute").

Plaintiff's problem arises at the third element.  It requires plaintiff to allege that defendant made the false statements during the course of termination and foreclosed other employment opportunities.  When analyzing whether an alleged stigmatizing statement was made during the course of termination, the court focuses on the "manner in which a public employee is terminated, and the statements made incident to the termination."  *Renaud v. Wyo. Dep't of Fam. Servs.*, 203 F.3d 723, 727 (10th Cir. 2000) (quotation cleaned up); *see also*

18

*Bjorklund v. Miller*, 467 F. App'x 758, 768 (10th Cir. 2012) ("A roughly contemporaneous statement made incident to the termination that concerns the manner or reasons for the employee's termination may qualify as one made in the course of termination of employment." (quotation cleaned up)). Here, plaintiff doesn't allege that Dr. Besthorn made defamatory statements contemporaneous with WSU's decision to remove plaintiff as the CCHT's director. Nor do Dr. Besthorn's alleged comments even concern plaintiff's termination as CCHT director. While the alleged false and derogatory statements about plaintiff—if made—are reprehensible, they aren't the kind of statements that can support an actionable stigma-plus claim. Plaintiff thus fails to state a claim against defendant Besthorn. And, because plaintiff has failed to state a constitutional violation against him, he's also entitled to qualified immunity. For those two independent reasons—(1) that plaintiff fails to state a claim, and (2) that qualified immunity precludes liability—the court dismisses plaintiff's claim against defendant Besthorn with prejudice.[1]

### b. Defendant Monk-Morgan

Plaintiff's claim against defendant Monk-Morgan suffers a similar fate, but for a different, and more straightforward reason. Ms. Monk-Morgan arrived near the end of this case's story when she took over the CCHT in summer 2020. Nonetheless, plaintiff sues Ms. Monk-Morgan for a statement she made around the time WSU closed the CCHT. Specifically, Ms. Monk-Morgan communicated a "false message to CCHT donors via phone calls and emails"

---

[1] In her response to defendants' motion, plaintiff argues she's also pleaded equal protection claims against defendant Besthorn for harassment and discrimination based on her race, religion, and sex. Doc. 12 at 22–23. But her Complaint didn't plead those claims. Instead, Count XXVI (the lone count asserted against defendant Besthorn) only pleads a stigma-plus liberty interest claim. *See* Doc. 1 at 108–11. Plaintiff chose which claims to assert in the Complaint. And she hasn't amended her Complaint to include more claims against defendant Besthorn. Thus, the court won't consider any claims plaintiff attempts to advance in her papers that aren't asserted in her Complaint. *See* Fed. R. Civ. P. 8(a)(2) (requiring a "short and plain statement of the claim showing that the pleader is entitled to relief").

by informing them that plaintiff "was willingly closing the CCHT." Doc. 1 at 41 (Compl. ¶¶ 342, 344). Plaintiff alleges no other context or detail about this statement.

No reasonable jury could find that Ms. Monk-Morgan's statement—as alleged by the Complaint—impugned plaintiff's "good name, reputation, honor, or integrity[.]" *McDonald*, 769 F.3d at 1212 (quotation cleaned up). Even if false, Ms. Monk-Morgan's message doesn't charge plaintiff with "dishonesty or immorality that might seriously damage [plaintiff's] standing or associations in the community and foreclose [her] freedom to take advantage of future employment opportunities[.]" *Melton v. City of Okla. City*, 928 F.2d 920, 927 (10th Cir. 1991). Thus, plaintiff's claim against Ms. Monk-Morgan isn't within "the parameters of a liberty interest case involving the discharge of a public employee." *Id.* at 926–27. And so, plaintiff fails to state a claim against defendant Monk-Morgan. Because plaintiff has failed to state a constitutional violation against defendant Monk-Morgan, she's also entitled to qualified immunity. For those two independent reasons—(1) that plaintiff fails to state a claim, and (2) that qualified immunity precludes liability—the court dismisses plaintiff's claim against defendant Monk-Morgan with prejudice.[2]

### 2. Equal Protection Claims Against Defendants Muma, Hippisley, and Lee

Plaintiff also asserts individual equal protection claims against defendants Muma (WSU's then-Acting President and Provost), Hippisley (Dean of the College of Liberal Arts), and Lee (plaintiff's fellow Social Work professor and one of her supervisors). Specifically, she alleges

---

[2]    Plaintiff again attempts to argue claims against Ms. Monk-Morgan that she didn't plead in her Complaint. *Compare* Doc. 12 at 17–19 (arguing claims for discrimination and retaliation under the Equal Protection Clause), *with* Doc. 1 at 111–14 (pleading only a stigma-plus liberty interest claim). The court won't consider these newly asserted theories because the Complaint doesn't assert them as claims. *See supra* n.1.

that she reported Dr. Besthorn's ongoing harassment to each of these three defendants, and that all three ignored her complaints.

"It is well established in this circuit that sexual harassment by a state actor can constitute a violation of the equal protection clause." *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1249 (10th Cir. 1999). And, a "supervisory employee may be held liable under section 1983 upon a showing of deliberate indifference to known sexual harassment." *Id.* at 1250. But, supervisory employees are liable under § 1983 only if they deliberately deprived plaintiff of her constitutional rights—and not when they merely were negligent in doing so. *Id.* Thus, to state a § 1983 equal protection claim against a supervisory employee, plaintiff "must state facts sufficient to allege 'defendants actually knew of and acquiesced in'" the alleged sexual harassment. *Id.* (quoting *Jojola v. Chavez*, 55 F.3d 488, 490 (10th Cir. 1995)).

Also, in our Circuit, "it has been clearly established since at least 1992 that a person who exercises the state's supervisory authority may be held liable for consciously acquiescing in sexually harassing conduct by a non-state actor over whom the state actor has authority." *Id.* at 1251 (citing *Woodard v. City of Worland*, 977 F.2d 1392, 1401 (10th Cir. 1992)); *see also Johnson v. Martin*, 195 F.3d 1208, 1219 (10th Cir. 1999) ("In instances in which a plaintiff demonstrates that a supervisor had actual knowledge of the harassment but failed to take any remedial action (*e.g.*, by investigating the allegations and taking disciplinary action against the harassing subordinate employee), courts have concluded that the supervisor may be held liable."). So, if plaintiff alleges sufficient facts capable of supporting a finding or inference that defendants Muma, Hippisley, or Lee actually knew about and failed to remedy her harassment complaints such that one or more of them acquiesced in the harassment, then plaintiff will state a claim for an equal protection violation. And, under our Circuit's precedents, that constitutional

21

violation, if proved, is clearly established and overcomes defendants' asserted qualified immunity. *See Fye v. Okla. Corp. Comm'n*, 175 F. App'x. 207, 211 (10th Cir. 2006) (denying qualified immunity because defendant's "complete inaction in the face of actual knowledge" of sexual harassment, if proven, violated plaintiff's equal protection rights which were, "at the time, clearly established"). The court considers plaintiff's allegations against each defendant, in turn. But first, it discusses a statute of limitations defense asserted by all three defendants.

### a. Timeliness

Defendants Muma, Hippisley, and Lee assert that plaintiff's claims against them are time-barred under the governing statute of limitations. For § 1983 claims, the court discerns the statute of limitations "from the personal-injury statute of the state in which the federal district court sits." *Mondragon v. Thompson*, 519 F.3d 1078, 1082 (10th Cir. 2008). That's Kansas. And in Kansas, "the statute of limitations period for personal injury actions is two years." *Lee v. Reed*, 221 F. Supp. 3d 1263, 1269 (D. Kan. 2016) (citing Kan. Stat. Ann. § 60-513(a)(4)). So, plaintiff's claims are timely only if they accrued during the two years before this case's filing, *i.e.*, October 25, 2019. *See* Doc. 1 (noting that plaintiff filed this lawsuit on October 25, 2021).

This deadline presents a problem for plaintiff's claim against Dean Hippisley. Plaintiff alleges she reported Dr. Besthorn's harassment to Dean Hippisley several times in August and October 2018 and May 2019. *See* Doc. 1 at 20–22, 29–30 (Compl. ¶¶ 158–167, 234–37). But she doesn't allege that she ever reported the harassment to him at a time within the limitations period. For that reason, her § 1983 claim against defendant Hippisley is time-barred. *See Herrera v. City of Espanola*, 32 F.4th 980, 991 (10th Cir. 2022) ("If from the complaint, the dates on which the pertinent acts occurred are not in dispute, then the date a statute of limitations

accrues is a question of law suitable for resolution at the motion to dismiss stage." (quotation cleaned up)). So, the court dismisses this claim with prejudice.

The story's a bit different for defendants Muma and Lee. While the bulk of plaintiff's allegations against these defendants occurred beyond the limitations period, plaintiff also has alleged that she reported harassment to both Dr. Muma and Dr. Lee within the two-year limitations period. *See* Doc. 1 at 35 (Compl. ¶¶ 288–89) (alleging plaintiff reported harassment to Dr. Muma in November 2019); *id.* at 39 (Compl. ¶¶ 320–23) (alleging plaintiff reported harassment to Dr. Lee in February 2020). The court concludes it's imprudent to dismiss plaintiff's claims against Dr. Muma and Dr. Lee on statute of limitations grounds at this early stage, when it's not entirely clear that her claims are extinguished. *See Wallace v. Kato*, 549 U.S. 384, 388 (2007) (explaining that "accrual occurs when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief" (quotation cleaned up)); *Herrera*, 32 F.4th at 991 (cautioning that courts may resolve a statute of limitations defense on a Rule 12(b) motion, but only "when the dates given in the complaint *make clear* that the right sued upon has been extinguished" (quotation cleaned up) (emphasis added)). Here, it's less than "clear" that the statute of limitations will bar these claims. So, the court declines to dismiss plaintiff's claims against defendants Muma and Lee based on a limitations defense. The court thus continues its analysis with defendant's substantive arguments.

### b. Defendant Muma

*First*, plaintiff alleges sufficient facts that, if proven, would both state a constitutional violation and overcome Dr. Muma's asserted qualified immunity. At multiple times in 2019, plaintiff complained to Dr. Muma about Dr. Besthorn's years-long harassment. *See* Doc. 1 at 27, 35 (Compl. ¶¶ 215–17, 288). Dr. Muma even acknowledged that he had received harassment

complaints from others about Dr. Besthorn.  *Id.* at 28 (Compl. ¶ 225).  But, he encouraged plaintiff to "set [her harassment complaints] aside moving forward," and told her "it's gonna be better for you . . . to let go of it."  *Id.* (Compl. ¶ 221).  In plaintiff's view, Dr. Muma, "clearly articulated" that WSU would not resolve her complaints.  *Id.* (Compl. ¶ 224).  In fact, plaintiff alleges, Dr. Muma echoed Dr. Besthorn's harassing comments and "suggested that he believed [p]laintiff had been having a sexual relationship with Dr. Matson."  *Id.* (Compl. ¶ 223). Sometime later, he emailed plaintiff that "should she continue to assert" her claims, WSU could consider her comments "defamatory."  *Id.* (Compl. ¶ 226).  Finally, and perhaps most significantly, plaintiff alleges that she once again reported harassment to Dr. Muma in November 2019, and, in response, he informed her WSU would end her employment as the CCHT's Executive Director.  *Id.* at 35 (Compl. ¶¶ 288–89).

Accepting all these allegations as true, taking them together, and drawing all inferences in plaintiff's favor, plaintiff sufficiently has alleged that Dr. Muma violated her equal protection rights.  And, Dr. Muma's alleged conduct, if proved, violated clearly established law.  *Fye*, 175 F. App'x at 211 (denying qualified immunity because defendant's "complete inaction in the face of actual knowledge" of sexual harassment, if proven, violated plaintiff's equal protection rights which were, "at the time, clearly established"); *Johnson*, 195 F.3d at 1220 (denying qualified immunity because "knowledge" of sexual harassment "and subsequent inaction is sufficient to establish supervisory liability under § 1983").

### c.  Defendant Lee

In contrast, plaintiff hasn't alleged sufficient facts against Dr. Lee to state a constitutional violation.  As a result, she also fails to overcome Dr. Lee's asserted qualified immunity.  Indeed, plaintiff's allegations against Dr. Lee are quite limited and they lack the kind of specific facts she

alleges against Dr. Muma.  Specifically, plaintiff alleges that in or around August 2019, she met

with Dr. Lee "to discuss the terms and conditions of her employment, and the ongoing

discrimination, harassment and retaliation[,]" to which Dr. Lee responded "I don't have time to

deal with the conflicts."  Doc. 1 at 31 (Compl. ¶¶ 250–51) (internal quotations omitted).  Then,

in February 2020, plaintiff continued "to seek assistance" from Dr. Lee about the "discrimination

and harassment she was experiencing[,]" but, in response, Dr. Lee "strongly implied" plaintiff

should leave WSU "if she was not happy" there.  *Id.* at 39 (Compl. ¶¶ 319–23).  The court

concludes these allegations aren't capable of supporting a finding or inference that Dr. Lee

knowingly disregarded plaintiff's harassment complaints to the extent that he acquiesced in the

harassment.  These allegations aren't like the ones made against Dr. Muma—that Dr. Muma

actively ignored plaintiff's repeated harassment complaints while echoing the harassment itself

and even threatening plaintiff to get her to drop her complaints.  So, plaintiff hasn't stated a

constitutional violation against Dr. Lee.  Because plaintiff has failed to do so, Dr. Lee's also

entitled to qualified immunity.  For those two independent reasons—(1) that plaintiff fails to

state a claim, and (2) that qualified immunity precludes liability—the court dismisses plaintiff's

claim against defendant Lee with prejudice.

### 3.  Conclusion for § 1983 Claims

In sum, the court dismisses, with prejudice, plaintiff's § 1983 claims against defendants

Besthorn (Count XXVI), Monk-Morgan (Count XXVII), and Lee (Count XXIV) for two

independent reasons:  (1) because plaintiff fails to state a constitutional violation against those

defendants, and (2), as a result, they're also entitled to qualified immunity.  And, the court

dismisses, with prejudice, the § 1983 claim against defendant Hippisley (Count XXV) because,

based on the facts and dates alleged in the Complaint, the claim against him is barred by the

statute of limitations.  But, the court finds plaintiff has alleged facts against defendant Muma sufficient to state both a constitutional violation and overcome qualified immunity.  So, plaintiff's claim against defendant Muma (Count XXIII) can proceed.

### C.      Race and Religion Claims

As relevant here, Title VII prohibits employers from discriminating against employees based on race or religion.  42 U.S.C. § 2000e-2(a)(1).  Title VII also prohibits employers from maintaining "a discriminatorily hostile or abusive [work] environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). An employer thus violates Title VII when it maintains a workplace "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]'"  *Id.* (quoting *Meritor*, 477 U.S. at 65, 67).

To state a plausible Title VII disparate treatment claim based on race or religion, plaintiff must allege facts capable of supporting a finding or inference that (1) she belongs to a protected class, (2) she sustained an adverse employment action, and (3) the circumstances give rise to an inference of discrimination based on race or religion.  *See Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021).  And, to state a plausible hostile work environment claim based on race or religion (*i.e.*, racial or religious harassment), plaintiff must allege facts capable of supporting a finding or inference "that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment," and (2) that the harassment was racial or religious or stemmed from racial or religious animus.  *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (quotation cleaned up) (stating the standard for racial harassment claims); *Milam v. Pafford EMS*, 729 F. App'x 632,

637 (10th Cir. 2018) (applying the same standard to religious harassment claim).  While Rule

12(b)(6)'s standard doesn't require plaintiff to establish a prima facie case in her Complaint, "the

elements of each alleged cause of action help to determine whether [p]laintiff has set forth a

plausible claim."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).

Defendants argue that plaintiff hasn't alleged facts capable of supporting an inference or

finding of discrimination or harassment based on her race or religion.  They're mostly right—

except for one claim in Count IV.  The court finds plaintiff plausibly has alleged a claim for

racial harassment/hostile work environment.  The court's analysis begins with plaintiff's race-

based claims.  Then, it analyzes her religion-based claims.

### 1. Claims Based on Race

As apparent from the alleged facts recited in Part I of this Order, the heart of this case is

Dr. Besthorn's alleged harassment campaign against plaintiff based on his belief that she

exchanged sexual favors with WSU administrators for her job.  But, plaintiff argues, that

harassment—while certainly sex-based—also had a racial component.  Specifically, plaintiff

alleges that more than once over the years, Dr. Besthorn derogatorily referred to plaintiff's split-

appointment at WSU as an "Indian deal."  Doc. 1 at 9, 15 (Compl. ¶¶ 67, 110).  More

specifically, Dr. Besthorn also allegedly told plaintiff and several other WSU employees that

"Native women are known for trading sex to get what they want[,]" and that "Indian women

have been known to serve a purpose to white men."  *Id.* at 9, 11 (Compl. ¶¶ 65–66, 78) (internal

quotations omitted).  Thus, plaintiff contends, all of Dr. Besthorn's sex-based comments over the

years support her claims for racial discrimination (Count III) and racial harassment (Count IV).

The court agrees, but only to an extent.  Despite the small number of explicitly race-

based comments, binding Tenth Circuit precedent "unmistakably requires [courts] to assess in

[their] analysis comments and behavior that in many circumstances might appear to be facially neutral (*i.e.*, devoid of any actual discriminatory animus)." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1224 (10th Cir. 2015); *see also Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 960 (10th Cir. 2012) (collecting cases and explaining that the Circuit has "long held that facially neutral abusive conduct can support a finding of racial animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly racially-discriminatory conduct" (quotation cleaned up)). Thus, the Circuit has instructed, district courts must conduct a "holistic analysis" of the workplace environment because it "may actually unearth the racial dimension of conduct that may superficially appear to be race-neutral." *Lounds*, 812 F.3d at 1227; *see also Chavez*, 397 F.3d at 833 ("[W]hat is important in a hostile environment claim is the *environment* . . . . Conduct that appears [race]-neutral in isolation may in fact be [race]-based, but may appear so only when viewed in the context of other [race]-based behavior."). "Much like a play cannot be understood on the basis of some of its scenes . . . a discrimination analysis must concentrate not on individual incidents, but on the overall scenario, which is informed by the sum total of those incidents." *Lounds*, 812 F.3d at 1223–24 (quotation cleaned up).

Mindful of that direction (and theatrical metaphor), when the court considers the entire workplace environment at WSU, it concludes plaintiff has alleged facts capable of supporting a claim for racial harassment/hostile work environment. For years, Dr. Besthorn spread the rumor that plaintiff traded sexual favors in exchange for her job at the CCHT. Plaintiff alleges this rumor permeated the School of Social Work and percolated up to the Dean of the College of Liberal Arts and even to WSU's then-Acting President. And, despite complaining about the harassment to several WSU administrators, plaintiff was told by each one of them to drop her

complaints. Dr. Besthorn's campaign against plaintiff extended to students, who he encouraged to stop working with plaintiff at the CCHT. It escalated to threatening conduct, such as when Dr. Besthorn allegedly broke into plaintiff's office, claimed ownership of her property, and broke several items on her desk. While most of these allegations are race-neutral, Dr. Besthorn's alleged belief that "Native women are known for trading sex to get what they want" suffices to push plaintiff's racial harassment claim over the line separating plausible and implausible claims. *Cf. Chavez*, 397 F.3d at 833 (allowing plaintiffs to "use a substantial amount of arguably gender-neutral harassment to bolster a smaller amount of gender-based conduct"). Thus, it's plausible Dr. Besthorn's harassment campaign against plaintiff was based on her sex *and* race. And so, plaintiff sufficiently has stated a claim for racial harassment/hostile work environment.

But plaintiff's disparate treatment claim suffers a different fate. That's because, as explained above, a disparate treatment claim requires at least one adverse employment action taken under circumstances giving rise to an inference of racial discrimination. *Ibrahim*, 994 F.3d at 1196. That's different from a hostile work environment claim, which turns on a holistic analysis of the entire workplace environment. Thus, for her disparate treatment claim to survive, plaintiff must make factual allegations to connect an adverse employment action with alleged facts capable of supporting an inference or finding of racial discrimination or animus. This plaintiff's Complaint fails to do.

In total, plaintiff alleges three race-based comments over a seven-year period:

- Dr. Besthorn's references to plaintiff's split-appointment at WSU as an "Indian deal," Doc. 1 at 9, 15 (Compl. ¶¶ 67, 110);

- Dr. Besthorn's comments to plaintiff and other WSU employees that "Native women are known for trading sex to get what they want[,]" and that "Indian women have been known to serve a purpose to white men[,]" *id.* at 9, 11 (Compl. ¶¶ 65–66, 78);

29

- Dr. Lee laughing at plaintiff for "being Native American" during an evaluation meeting in February 2020, *id.* at 39 (Compl. ¶¶ 320–21).[3]

Plaintiff's Complaint never connects any of these comments to an adverse employment action. "An adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1252 (10th Cir. 2021) (quotation cleaned up). Plaintiff doesn't allege that Dr. Besthorn or Dr. Lee ever took any such action. While both negatively evaluated plaintiff several times over the years, a negative evaluation, without more, doesn't qualify as an adverse employment action. *See Kenfield v. Colo. Dep't of Pub. Health & Env't*, 557 F. App'x 728, 732 (10th Cir. 2014) (concluding that plaintiff failed to show how a "downgrade" of her "evaluation rating" was an adverse employment action because she failed to adduce evidence that the downgrade negatively had affected her salary or otherwise negatively had affected her employment). Also, Dr. Besthorn and Dr. Lee's votes against plaintiff receiving tenure aren't adverse employment actions because their votes weren't dispositive of the promotion decision. The actual decision-makers evaluating plaintiff granted her tenure. *Cf. Lee v. N.M. State Univ. Bd. of Regents*, 102 F. Supp. 2d 1265, 1275–76 (D.N.M. 2000) (finding plaintiff had established an adverse employment action where one professor's recommendation against tenure led to university denying tenure and ultimately terminating plaintiff's employment); *Aquilino v. Univ. of Kan.*, 268 F.3d 930, 934 (10th Cir. 2001) (concluding that university's "removal of [plaintiff] from the

---

[3] Plaintiff also invokes Ms. Monk-Morgan's comment to OIEC investigators that plaintiff doesn't "get to tell me, as a white woman, what to do with whatever social capital I have." Doc. 1 at 40 (Compl. ¶ 328). The Complaint provides no context for this comment. Even construing all inferences in plaintiff's favor, the court finds no basis for a reasonable jury to find that Ms. Monk-Morgan's comment supports a finding or inference of racial discrimination or animus against plaintiff.

dissertation committee" six months after denying her tenure was "simply not an adverse employment action" because it didn't affect any significant change in her employment status).

Ultimately, plaintiff doesn't allege any facts capable of tying any alleged race-based comment to the ultimate adverse employment action in this case: that WSU terminated plaintiff's employment as the CCHT's executive director. And, "[i]solated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in" adverse employment actions. *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994); *see also LaChica v. Russell Stover Chocolates, LLC*, 853 F. App'x 283, 288 (10th Cir. 2021) (reiterating that "stray remarks and anecdotal evidence of discrimination unrelated to [the adverse employment action]" are insufficient to show discriminatory animus (quotation cleaned up)). Thus, the Complaint fails to state a claim for disparate treatment based on race. The court dismisses that claim with prejudice.

### 2.  Claims Based on Religion

Plaintiff also raises claims for disparate treatment (Count V) and hostile work environment/harassment (Count VI) based on her religion. The same standards for the race-based claims also apply to these religion-based claims. *See Ibrahim*, 994 F.3d at 1200. But, analyzing these claims is much more straightforward. Plaintiff's allegations about her religion are thin. She alleges that, at some point between 2013 and 2016, Dr. Besthorn called her anti-trafficking work "religious rhetoric" and called plaintiff a "crazy Christian." Doc. 1 at 10 (Compl. ¶¶ 68–69) (internal quotations omitted); *see also id.* ("I see you and your husband are doing a lot of work with that church he is pastoring . . . there is more than just your anti-sex perspective[.]" (internal quotations omitted)). These allegations don't support religious discrimination or harassment claims against WSU.

31

*First*, plaintiff fails to connect Dr. Besthorn's comments about her religion to any actionable adverse employment action.  So, she fails to state a claim for religious discrimination.  *See Cone*, 14 F.3d at 531 ("Isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in [adverse employment actions].").

And *second*, one comment about plaintiff's religion can't suffice to state a plausible hostile work environment claim.  To state such a claim, plaintiff must allege "more than a few isolated incidents of [religious] enmity."  *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) (quotation cleaned up) (affirming summary judgment against racial hostile work environment claim).  Instead, she must allege "a steady barrage of opprobrious [religious] comments."  *Id.*; *see also Lounds*, 812 F.3d at 1223.  Only then is the harassment so pervasive that it supports an actionable hostile work environment claim.  Thus, Dr. Besthorn's alleged comments about plaintiff's religion—made once and several years before any adverse employment action—can't support a plausible religious harassment/hostile work environment claim.  *Milam*, 729 F. App'x at 637 (holding that two comments potentially establishing religious animus still wouldn't "establish a hostile work environment because a few isolated incidents of religious enmity or sporadic religious slurs do not demonstrate pervasive or severe harassment" (quotation cleaned up)); *see also Chavez*, 397 F.3d at 832 (holding that "two racially offensive remarks" fell "far short of the 'steady barrage' required for a hostile environment claim").  So, the court dismisses plaintiff's Title VII religion claims with prejudice.

### D.    Title IX Claims

Title IX prohibits discrimination "on the basis of sex" in educational programs that receive federal funds.  20 U.S.C. § 1681(a).  This prohibition covers employment discrimination, *Throupe*, 988 F.3d at 1251, and retaliation against individuals who report discrimination, *Hiatt v.*

32

*Colo. Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017). Plaintiff brings six Title IX claims. She asserts three distinct retaliation claims based on (a) reporting harassment (Count IX), (b) encouraging students to report harassment (Count X), and (c) complaining about an inadequate investigation (Count XI). She also asserts claims for sex discrimination (Count XII), sexual harassment/hostile work environment (Count XIII), and retaliatory harassment (Count XIV). WSU moves to dismiss all six of these claims.

Bubbling at the surface of WSU's papers is a thinly veiled grievance: plaintiff doesn't plead her Title IX claims with the specificity WSU would like, and so, the court should dismiss them. *See, e.g.*, Doc. 21 at 29 (urging the court to "dismiss this claim outright rather than attempt to analyze or force WSU to guess which [Title IX] theory [p]laintiff wants to use on a given day[.]"). But the court is unaware of any authority suggesting it's appropriate to dismiss a plaintiff's claim just because responding to it may require considerable effort from a defendant. "Federal pleading rules call for 'a short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014); *see also Evans v. McDonald's Corp.*, 936 F.2d 1087, 1091 (10th Cir. 1991) ("The purpose of 'fact pleading,' as provided by Fed. R. Civ. P. 8(a)(2), is to give the defendant fair notice of the claims against him without requiring the plaintiff to have every legal theory or fact developed in detail before the complaint is filed and the parties have opportunity for discovery."). At this stage, plaintiff need only "provide allegations which are clear enough so that the opposing party and the court can discern a factual and legal basis for [her] claims." *Richeson v. United States*, 849 F. App'x 726, 728 (10th Cir. 2021). Plaintiff sufficiently has

33

pleaded enough facts capable of supporting her Title IX claims.  The court, below, briefly explains its reasoning for rejecting WSU's arguments.

### 1.  Title IX Applies to Employment Discrimination Claims

*First*, WSU argues that plaintiff can't bring a Title IX discrimination claim because it duplicates her Title VII discrimination claim (which WSU hasn't moved to dismiss).  Citing two out-of-Circuit decisions—*Lakoski v. James*, 66 F.3d 751, 753–54 (5th Cir. 1995), and *Waid v. Merrill Area Public Schools*, 91 F.3d 857, 862 (7th Cir. 1996)—WSU contends "Title VII provides the proper" and only recourse for employment discrimination claims.  Doc. 8 at 29. But, the court recently rejected this argument, adopting Judge Robinson's thorough analysis of the issue in *Fox v. Pittsburg State University*, 257 F. Supp. 3d 1112 (D. Kan. 2017).  *See Kincaid v. Unified Sch. Dist. No. 500, Kan. City, Kan.*, 572 F. Supp. 3d 1081, 1091–92 (D. Kan. 2021). And, in our Circuit, courts "have generally assessed Title IX [employment] discrimination claims under the same legal analysis as Title VII claims." *Throupe*, 988 F.3d at 1251 (internal quotations omitted) (applying Title VII framework to Title IX claims even though plaintiff had "not brought any claims under Title VII"); *see also Hiatt*, 858 F.3d at 1315–23 (explaining that Title IX "includes a prohibition on employment discrimination in federally funded educational programs" and applying Title VII standards simultaneously to Title VII and Title IX claims). The court thus rejects WSU's argument that Title VII is the exclusive vehicle for employment discrimination claims based on sex in federally funded educational programs.

### 2.  Plaintiff Need Not Plead a Particular Harassment Theory

*Next*, against plaintiff's harassment claims, WSU argues that plaintiff inconsistently toggles between a "direct discrimination" claim and an "indirect discrimination" (or "deliberate indifference") claim.  *See Jauquet v. Green Bay Area Cath. Educ., Inc.*, 996 F.3d 802, 807 (7th

Cir. 2021) (contrasting a "'direct' or 'institutional' Title IX" theory, which "show[s] that the school itself discriminated against a person on the basis of their sex[,]" with "a theory of 'indirect' discrimination by way of student-on-student harassment that is so severe that the harassment functionally excludes a student from school activities on the basis of sex"). But, this argument appears to stem from both parties' misdirected attempt to import Title IX's distinct "deliberate indifference" jurisprudence involving students at federally funded schools into this case: a mine-run employment discrimination case involving *employees* of the schools. *Cf. Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285, 290–91 (1998) (requiring Title IX *student* plaintiffs to show school officials were deliberately indifferent to teacher-student harassment); *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999) (adopting the same standard for student-student harassment); *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1174–79 (10th Cir. 2007) (discussing *Gebser* and *Davis* and applying their principles to *student's* claim that federally funded university maintained "a policy of deliberate indifference to providing adequate training or guidance" that was "obviously necessary" to prevent sexual assault and harassment among university students). But in their defense, our Circuit "generally assesse[s] Title IX [employment] discrimination claims under the same legal analysis as Title VII claims." *Throupe*, 988 F.3d at 1251 (internal quotations omitted). Thus, as the court views the lay of the land for this case, there's no need to muse about the various legal theories that might support a *student's* Title IX claim—because plaintiff here isn't a student. In other words, the familiar Title VII standards apply to plaintiff's Title IX claim for employment discrimination.

Thus, to state a sexual harassment/hostile work environment claim, plaintiff must allege "(1) [she] was discriminated against because of [her] sex, and (2) that the discrimination was

sufficiently severe or pervasive such that it altered the terms or conditions of [her] employment."
*Id.* "An employer can be held liable if its employees create a hostile work environment and it
knew or should have known about the conduct but failed to stop it." *Id.* (quotation cleaned up).
Plaintiff's allegations more than suffice to meet this standard.

Accepting plaintiff's allegations as true, Dr. Besthorn spread a rumor for eight years that
plaintiff had traded sexual favors with WSU administrators in exchange for her split-appointment
as a social work professor and the CCHT's director. He repeated this rumor publicly and
privately—to plaintiff herself, to students in his classes, to colleagues in department meetings,
and to WSU administrators. He broke into plaintiff's office, claimed ownership of her property,
and damaged several of her personal items. He encouraged students to stop working with her.
He told at least one student that plaintiff was a "crazy prostitute." He negatively evaluated
plaintiff in several annual reviews. He voted against her receiving tenure.

Despite plaintiff's repeated complaints to several WSU administrators about this ongoing
harassment—all of whom acknowledged past harassment issues with Dr. Besthorn—the problem
continued. Indeed, WSU administrators actively avoided the issue. Dean Matson suggested
plaintiff stop attending department meetings to avoid the harassment. He excused the rumors
about plaintiff because he "understood" that plaintiff was "young and pretty." Doc. 1 at 14
(Compl. ¶ 102) (internal quotations omitted). Dr. Bolin suggested that plaintiff "tone down" her
accomplishments because they "upset the men" in the department. *Id.* at 13 (Compl. ¶ 97)
(internal quotations omitted). He recommended that plaintiff include Dr. Besthorn on her
publications and other academic work, *i.e.*, give him credit for work plaintiff had performed.
Dean Hippisley told plaintiff more than once that she was "lucky" to have her job and her salary
as "as a woman so early in her career[.]" *Id.* at 22, 25 (Compl. ¶¶ 167, 195). And, Acting

36

President Muma, essentially threatened plaintiff to drop her harassment complaints, telling her that WSU would consider any continued complaints defamatory.  At almost every turn, WSU administrators ignored and excused Dr. Besthorn's harassment.  And, in the midst of his harassment of plaintiff, WSU promoted Dr. Besthorn to department chair, giving him even more supervisory authority over plaintiff than he already had.  All these allegations—accepted as true, taken together, and viewed in the light most favorable to plaintiff—suffice to state a claim for sexual harassment/hostile work environment.

### 3.  Plaintiff Linked Protected Activity to Adverse Actions

*Last*, for plaintiff's retaliation claims, WSU argues that she's failed to link any protected activity to a resulting adverse action.  So, they argue, she's failed to allege a causal connection between the two.  The court disagrees.

To state a retaliation claim, plaintiff must allege that:  (1) "she engaged in protected activity; 2) defendant had knowledge of the protected activity; 3) materially adverse school-related action was taken against plaintiff; and 4) there was a causal connection between the protected activity and the adverse action."  *Tackett v. Univ. of Kan.*, 234 F. Supp. 3d 1100, 1109 (D. Kan. 2017).  For the third element, an action is "materially adverse" if it is "sufficiently severe or pervasive that it could well dissuade a reasonable worker from engaging in protected activity."  *Adcox v. Brennan*, No. 15-cv-9258-JWL, 2017 WL 2405326, at *7 (D. Kan. June 2, 2017) (first citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006); then citing *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1217–19 (10th Cir. 2008)).

WSU faults plaintiff for not specifying the contours of her various retaliation claims.  For example, WSU argues that it's "left to guess or wander through 100+ pages to determine" the "how, or who, or when" for plaintiff's claims.  Doc. 8 at 31.  And there's something to this observation, for the Complaint makes allegations in 918 distinct paragraphs.  But the Complaint,

while quite long, isn't as dense as WSU suggests. The answers to WSU's questions are readily apparent.

Counts IX and XI allege that WSU retaliated against her for participating in harassment investigations and complaining about WSU's responses to her complaints. Plaintiff lodged this complaint several times over the years. It's not necessary, at this stage, to tie every single complaint to a corresponding adverse action. Plaintiff's factual allegations reveal at least one clear example of protected activity followed by materially adverse action. Plaintiff participated in OIEC's fall 2019 investigation into her harassment complaints. Doc. 1 at 32 (Compl. ¶¶ 254–261). Around the same time, WSU began to pressure plaintiff's role at the CCHT. It fired plaintiff's husband as the CCHT's finance director. *Id.* at 31 (Compl. ¶¶ 244–45). It discussed moving the CCHT off-campus. *Id.* at 32 (Compl. ¶ 262). It instructed College of Liberal Arts employees to stop communicating with the CCHT. *Id.* at 35 (Compl. ¶ 285). And then, after plaintiff again reported harassment to Acting President Muma in November 2019, WSU decided to terminate plaintiff's employment as the CCHT's executive director. *Id.* (Compl. ¶¶ 288–90). The OIEC investigation and plaintiff's ongoing harassment complaints—alongside the simultaneous squeeze against the CCHT—plead a clear cause and effect. The allegations surrounding these contemporaneous events support a finding or inference of retaliation against protected activity.

Similarly, in Count X, plaintiff alleges WSU retaliated against her for reporting student complaints about sex discrimination. Plaintiff doesn't specify the resulting adverse action under the Count X heading. But the Complaint plainly alleges that WSU, in response to plaintiff's harassment reports on her students' behalf during the fall 2019 semester, formally reprimanded

her during the spring 2020 semester.  *Id.* at 36–37 (Compl. ¶¶ 299–301).  That allegation is a textbook allegation of materially adverse action following a protected activity.

The court likewise concludes that plaintiff sufficiently has alleged a claim for retaliatory harassment in Count XIV.  The court previously has surveyed the distinctions between "'discrete'" retaliation claims "based on a 'certain retaliatory act[,]'" and "'retaliatory harassment'" claims that are "'based on the aggregate effect of the actions taken against'" a plaintiff.  *See Kincaid*, 572 F. Supp. 3d at 1090 (quoting *Turrentine v. United Parcel Serv., Inc.*, 645 F. Supp. 2d 976, 985 (D. Kan. 2009)).  For her retaliatory harassment claim, plaintiff has alleged a series of retaliatory acts by various WSU administrators over the years in response to her frequent harassment complaints.  Accepting her allegations as true, Dr. Besthorn and Dr. Lee negatively evaluated her almost every year after 2014.  Dean Hippisley repeatedly denied her additional compensation requests and her requests to attend professional conferences.  He also relocated the CCHT to the same floor as his office, which plaintiff alleges was "a known form of retaliation at WSU."  Doc. 1 at 23 (Compl. ¶ 181).  He restricted the courses she taught, without her input.  And, he denied plaintiff's request to attend an invite-only conference in Ireland—what he called a "spa trip"—even though a CCHT donor had funded the trip.  *Id.* at 25 (Compl. ¶¶ 199–203).  WSU eventually returned the funds to the CCHT donor, which plaintiff alleges was "unheard of[.]"  *Id.* at 26 (Compl. ¶¶ 206–07).  Combined with WSU removing plaintiff as CCHT director and eventually closing the CCHT, plaintiff has alleged more than enough facts to support a claim for retaliatory harassment.  The aggregate effect of the alleged retaliatory acts, taken in response to plaintiff's harassment complaints, "might well have dissuaded a reasonable employee from making a charge of discrimination[.]"  *Turrentine*, 645 F. Supp. 2d at 986.

**IV.     Conclusion**

The bottom line is this: some claims stay, others go. Specifically, plaintiff sufficiently has alleged facts capable of supporting plausible Title IX claims against WSU for retaliation, sex discrimination, sexual harassment/hostile work environment, and retaliatory harassment (Counts IX, X, XI, XII, XIII, XIV). She's also alleged a plausible Title VII race harassment/hostile work environment claim against WSU (Count IV), as well as a § 1983 claim against defendant Richard Muma in his individual capacity (Count XXIII).

But plaintiff hasn't alleged plausible Title VII claims for disparate treatment based on race (Count III) nor religious discrimination or harassment (Counts V and VI). Nor has plaintiff alleged plausible § 1983 claims against individual defendants Kyoung Lee, Andrew Hippisley, Fred Besthorn, or Kaye Monk-Morgan (Counts XXIV, XXV, XXVI, XXVII), for specific reasons discussed above. The court thus dismisses these claims with prejudice.[4] Finally, plaintiff's KAAD claims (Counts XV, XVI, XVII, XVIII, XIX, XX, XXI, XXII) are barred by Eleventh Amendment immunity. So, the court dismisses those claims without prejudice because it lacks subject matter jurisdiction over them.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Partial Motion to Dismiss for Failure to State a Claim (Doc. 7) is granted in part and denied in part.

---

[4]     Generally, "a dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile[.]" *Knight v. Mooring Cap. Fund, LLC*, 749 F.3d 1180, 1190 (10th Cir. 2014) (quotation cleaned up). Plaintiff requests that, if the court dismisses any of her claims, that it give her "the opportunity to amend her Complaint to include any further detail" the court may require. Doc. 12 at 43. But plaintiff already had such an opportunity after defendants filed their partial Motion to Dismiss. Rather than amend her Complaint in response to the motion (as was her right under Fed. R. Civ. P. 15(a)(1)(B)), plaintiff chose to litigate the motion's merits. That choice leads the court to conclude that amendment is futile. Also, plaintiff doesn't identify any alleged facts that would shore up the claims the court dismisses. The court need not grant leave to amend where plaintiff "fail[s] to identify the specific factual allegations [she] would allege in an amended complaint." *Carroll v. Lawton Indep. Sch. Dist. No. 8*, 805 F.3d 1222, 1231 (10th Cir. 2015).

**IT IS SO ORDERED.**

**Dated this 2nd day of August, 2022, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

41